IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Justin Spiehs,

Plaintiff,

v.

Board of County Commissioners, Shawnee County, Kansas d/b/a Shawnee County Adult Detention Center,
*
Armor Health of Shawnee County, LLC,
*
Adrienne Nicole Bell, in her individual capacity,
*
Sonya Ann Priest (also appearing in records as Scarborough-Priest), in her individual capacity,
*
Christopher J. White, in his individual capacity,
*
Salai T. Illo (sued as "Lillo" in a prior pleading), in his individual capacity,
*
Aresha Lige (sued as "Officer Lige" in the Amended Complaint), in her individual capacity,
*
Alexander Joseph Bender, in his individual capacity,
*
Jeffrey Shannon, in his individual capacity,
*
Shannan Marie Heldenbrand (sued as "Lt. Jane Doe" in the Amended Complaint), in her individual capacity,
*
Christopher S. Torrez, in his individual capacity,
*

Case No. 5:26-cv-04020-TC-BGS

Shannon L. Addington, in an individual capacity,
*
Michelle Jorgensen, in her individual capacity,
*
Shade Downs, RN, in an individual capacity,
*
Kristen "Kris" Stanfill, LPN (sued as "Kris Stansfill" in the Amended Complaint), in her individual capacity,
*
Hallie Hay, RN, in her individual capacity, and
*
Hiliary Miller, RN (sued as "Hillary Miller" in the Amended Complaint), in her individual capacity

Defendants.

**SECOND AMENDED COMPLAINT**

Plaintiff Dr. Justin Spiehs alleges as follows:

**NATURE OF THE ACTION**

1. On September 8, 2025, Dr. Spiehs, a pretrial detainee arrested on a municipal-ordinance charge, declined to answer non-identifying intake and behavioral-health screening questions. He had identified himself, provided his name, date of birth, and address, and posed for his booking photograph. He had made no threat of self-harm, and the arresting officer reported no suicide risk.

2. Because he declined to answer, Defendants placed him on suicide watch. They did so under a written Armor Health protocol that converts refusal to participate in screening into suicide-watch placement, and they implemented the placement through the County's trained practice of removing a detainee's clothing for suicide

watch. Defendant Sgt. Christopher J. White told Dr. Spiehs on video that he was on suicide watch "[b]ecause you didn't answer questions" and that removing his clothes was required "[b]ecause that's a policy." Armor's behavioral-health worker recorded that Dr. Spiehs was "[p]laced on SW due to refusing to answer questions."

3. Officers then forcibly stripped Dr. Spiehs naked in front of multiple staff, re-handcuffed him, naked, so tightly that he cried out, and left him in a cold watch cell for approximately eleven hours with injured wrists and hands, while staff charted his injuries, recorded that he had "refused to get dressed," and provided no treatment or meaningful medical response. He was released the next morning without ever having been found to present any suicide risk.

4. This action seeks damages under 42 U.S.C. § 1983 and Kansas law for the unreasonable search, excessive force, pretrial punishment, retaliation, compelled speech, denial of medical care, and failure to intervene that followed, and against the County and its contracted medical provider for the policies that caused them.

**JURISDICTION AND VENUE**

5. This action arises under 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), because those claims form part of the same case or controversy.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in Shawnee County, Kansas.

**PARTIES**

7. Plaintiff Dr. Justin Spiehs is a Kansas resident who regularly engages in peaceful political expression and civic advocacy in public forums. At all relevant times he was a pretrial detainee.

8. Defendant Board of County Commissioners, Shawnee County, Kansas, d/b/a Shawnee County Adult Detention Center ("Shawnee County," the "County," or "ADC"), is a governmental body and political subdivision of the State of Kansas that operates the ADC. It has appeared in this action.

9. Defendant Armor Health of Shawnee County, LLC ("Armor") contracted with Shawnee County to provide medical and behavioral-health services to detainees at the ADC, including intake screening and suicide-risk screening, suicide-watch placement and removal, and treatment. In performing those traditional public functions for detainees, Armor and its employees acted under color of state law. *West v. Atkins*, 487 U.S. 42 (1988).

10. The following Defendants were, at all relevant times, employees of Shawnee County acting under color of state law within the course and scope of their employment, and each is sued in his or her individual capacity: Adrienne Nicole Bell; Sonya Ann Priest (also appearing in records as Scarborough-Priest); Sgt. Christopher J. White; Salai T. Illo (sued as "Lillo" in a prior pleading); Aresha Lige (sued as "Officer Lige" in the Amended Complaint); Alexander Joseph Bender; Jeffrey Shannon; Lt. Shannan Marie Heldenbrand (sued as "Lt. Jane Doe" in the Amended Complaint); Sgt. Christopher S. Torrez; and Sgt. Shannon L. Addington.

11. The following Defendants were, at all relevant times, employees or agents of Armor acting under color of state law, and each is sued in his or her individual capacity: Michelle Jorgensen, a behavioral-health worker designated by Armor as a qualified behavioral-health professional; Hiliary Miller, RN; Kristen "Kris" Stanfill, LPN (sued as "Kris Stansfill" in the Amended Complaint); Hallie Hay, RN; and Shade Downs, RN.

12. Defendant Lt. Heldenbrand was the shift lieutenant notified of Dr. Spiehs's suicide-watch placement on the evening of September 8, 2025. Plaintiff previously identified her as "Lt. Jane Doe." The County's own records identify her by name and employee number in connection with the planned clothing removal described below.

13. Defendants Torrez and Addington were line supervisors (sergeants) on duty at the ADC during Dr. Spiehs's confinement. At times relevant to the allegations concerning the bearded supervisory sergeant described below, Plaintiff presently has evidentiary support identifying that officer as either Defendant Sgt. Christopher S. Torrez or Defendant Sgt. Shannon L. Addington. County records place Torrez in the relevant booking and medical-module sequence and identify Addington as a supervisory officer on duty during the relevant period. Plaintiff therefore pleads in the alternative, under Fed. R. Civ. P. 8(d)(2), that the acts attributed to the bearded sergeant were committed by Torrez or, alternatively, Addington. Plaintiff's allegations as to which of the two committed each act will likely have further evidentiary support after a reasonable opportunity for discovery, and discovery is expected to establish which Defendant committed the particular acts alleged.

14. The statement "He can take his ass to suicide watch then," described below, was made by Defendant Jorgensen or, alternatively, Defendant Miller. Both were present at the intake area, both attempted to screen Dr. Spiehs, and the County has stated that Miller told Dr. Spiehs he was going on screen-pending status and suicide watch. Plaintiff pleads in the alternative that Jorgensen, Miller, or both made and implemented the suicide-watch decision and that one of them made the statement.

15. Although Dr. Spiehs was a pretrial detainee, Defendants' policies refer to all persons in custody as inmates. A custodial relationship existed between Dr. Spiehs and the County and Armor at all relevant times.

## FACTS

### A. PRIOR INTAKE ON JUNE 14, 2025

16. On June 14, 2025, Dr. Spiehs was arrested and booked into the ADC. Defendants Bell and Priest handled his processing. He told them he would answer only identifying questions.

17. Bell and Priest told him he could be placed on suicide watch if he did not answer questions beyond identification. Defendant Jorgensen also attempted to screen him. He declined to answer the non-identifying screening questions, as he would again on September 8.

18. On June 14, the same refusal by the same detainee, screened by the same behavioral-health worker, resulted in no suicide watch. He was not stripped or isolated. Armor's records note no issue, and he was processed and released within a few hours.

### B. DR. SPIEHS'S ADVOCACY AND THE COUNTY'S ATTENTION TO HIM

19. Between June and September 2025, Dr. Spiehs engaged in protected First Amendment activity directed at local officials, including a public protest arrest, requests under the Kansas Open Records Act beginning June 17, 2025, and, beginning in late August 2025, standing silently with signs criticizing Topeka Police Department officers.

20. Before September 8, 2025, his activity had drawn the attention of ADC leadership. The Director of the Shawnee County Department of Corrections asked staff, in substance, "What's the story behind this inmate?" and ADC investigators pulled the video of his June intake.

21. On September 8, 2025, Topeka police arrested Dr. Spiehs on a municipal misdemeanor charge of disobeying a lawful police order and brought him to the ADC. The arresting officer completed the County's arrestee suicide-risk form and reported nothing indicating any risk.

### C. INTAKE ON SEPTEMBER 8, 2025

22. Dr. Spiehs arrived at the ADC at approximately 3:30 p.m. As he arrived, he heard Bell and Priest say to each other, "That's the same guy who didn't want to answer our questions."

23. The officers who brought Dr. Spiehs into the jail kept him handcuffed behind his back in an arrestee holding room for approximately seventy minutes. He sat or stood quietly and offered no physical resistance.

24. At approximately 3:41 p.m., a staff member in medical scrubs approached Dr. Spiehs with a form, spoke with him briefly, and moved on. On information and belief,

this was the first attempt to screen him, and he did not answer the non-identifying questions. No suicide watch or comparable precaution followed that encounter.

25. At approximately 4:41 to 4:43 p.m., an officer patted Dr. Spiehs down while he remained clothed and then removed his handcuffs. He did not resist. The County nonetheless completed a "strip search" form for him timed at approximately 4:45 p.m., checking "contraband" as the reason without stating any supporting facts.

26. Dr. Spiehs was then locked in a holding cell (Cell 4C) for approximately ninety minutes by the bearded sergeant described below, following an unrelated altercation between another detainee and an officer. No staff member told him he was on suicide watch or asked him any mental-health question during that period. No physical incident is documented during that period.

27. When Dr. Spiehs next appears on surveillance video, at approximately 6:31 p.m., he is unrestrained and calm at the booking desk. He remained so until approximately 6:52 p.m. He provided his name, date of birth, and address, posed for his booking photograph, and declined to answer non-identifying questions such as questions about his employment, education, and religious affiliation. He stated that he did not believe he was legally required to answer them.

28. Staff told him that answering all intake questions was necessary for processing. No staff member identified any statute or regulation requiring him to answer. No staff member told him he was a suicide risk or that he had shown any sign of self-harm. Bell and Priest told him that if he did not answer, he would be placed on suicide

watch. He told them he had given no indication that he was suicidal and asked to speak to a supervisor and to make a phone call. Both requests were refused.

29. During booking, Dr. Spiehs told staff that what they were doing was unlawful and that he would hold them accountable. The County has since identified his "threatening litigation" as one of the reasons he supposedly posed a threat or created a safety risk.

30. At approximately 6:30 p.m., Priest made a note that a records alert reflected a prior suicide watch or close observation. That note led only to the comment that he would "need to speak with behavioral health." No contemporaneous decisionmaker identified any prior history as the reason for the placement that followed.

31. At approximately 6:52 p.m., Dr. Spiehs walked, unescorted, to a second desk, where he spoke with staff. A woman in plain clothes identified herself as a mental-health worker and said, in substance: "I'm going to ask you some questions, and if you don't want to answer them, you don't have to. Do you want to answer my questions?" On information and belief, that worker was Defendant Jorgensen. Dr. Spiehs remained silent. The worker told staff, falsely, that he had said he did not want to answer her questions. He immediately said that was not true.

32. Immediately afterward, Defendant Jorgensen or, alternatively, Defendant Miller said in a raised voice, "He can take his ass to suicide watch then." Dr. Spiehs had exhibited no self-harm behavior and had expressed no suicidal ideation. No one administered a suicide-risk assessment.

33. A staff member said, “Bond is stopped unless he answers.” Staff told him he would be in the cell “until he sees the judge.”

34. At approximately 6:54 p.m., while Dr. Spiehs stood at the second desk without physical resistance, an officer handcuffed him behind his back. Sgt. White told him he was “going on suicide watch” because he was not compliant with answering questions and that he could go voluntarily or he would be forced. Dr. Spiehs said he did not consent but complied with every physical instruction.

35. Before Dr. Spiehs reached the watch cell, and at approximately 6:55 p.m., an officer posted paperwork on the outside of the cell door, and a suicide-resistant smock and blanket had already been placed in the cell. On information and belief, the posted paperwork was the suicide-watch observation checklist.

36. Armor’s records reflect that Jorgensen notified security of the suicide-watch placement at approximately 7:00 p.m., entered the electronic suicide-watch alert at approximately 7:25 p.m., and saved her screening form at approximately 7:27 p.m. Each of those entries came after Dr. Spiehs had already been handcuffed and after the cell had been prepared for suicide watch, and the alert and the form were entered only after his clothing had been removed.

37. Jorgensen’s screening form states: “Placed on SW due to refusing to answer questions.” On the Armor screening form, the question whether the detainee was “unable or unwilling to participate” was marked “Yes.” The form identifies no other basis for the placement.

38. Defendant Hay entered a "Screen Pending" alert in Armor's system at approximately 7:38 p.m.

**D. THE FORCED STRIP**

39. At approximately 6:55 p.m., officers escorted Dr. Spiehs, handcuffed, to a single cell in the medical module. A County officer held him by the arm. Defendant Bell operated a handheld video camera. Dr. Spiehs asked for water, stating that he had been in custody for hours without any.

40. In the cell, officers held Dr. Spiehs facing the wall with his hands cuffed behind his back. For approximately three minutes he stood at the wall without physical resistance while arguing, verbally, that he was not suicidal and had not been given a lawful order.

41. Sgt. White told him he was being "dressed in on suicide watch." When Dr. Spiehs asked why he was on suicide watch, White answered, "Because you didn't answer questions." When Dr. Spiehs asked, "That means I'm on suicide watch?", White answered, "It sure does." When Dr. Spiehs asked why he had to remove his clothes, White answered, "Because that's a policy."

42. Dr. Spiehs repeatedly said that he had given no indication that he was suicidal and asked White to give him a lawful order he could follow. White instead asked whether Dr. Spiehs would remove his clothing if White removed the handcuffs, and then said, "I'll give you one more chance. If I take these off, you get rid of your clothing." When Dr. Spiehs asked, "For what?", White said, "Because I told you." Defendant Lige told Dr. Spiehs that the stripping was going to happen because he had not complied with answering questions.

43. Without removing the handcuffs, and before Dr. Spiehs had offered any physical resistance, White crouched and pulled down and removed Dr. Spiehs's pants and shoes while Defendant Illo held his left arm and Defendant Shannon held his right arm, pinned against the wall. The first statement by any officer characterizing Dr. Spiehs as resisting—"Don't resist"—was made at the moment officers began pulling down his pants while he remained handcuffed.

44. White applied pain-compliance pressure to Dr. Spiehs's fingers, hands, and wrists. Dr. Spiehs cried out in pain, said "I am not resisting," and asked, "What are you doing, White?" He turned to Bell and asked, "Why are you just standing there filming this?"

45. A fourth officer joined the hands-on restraint. Officers then removed Dr. Spiehs's handcuffs, pinned his arms against the wall, and pulled his shirt over his head, leaving him completely naked while surrounded by four officers. Female staff, including at least one female officer who remained in the cell during the removal of his clothing, observed him.

46. Officers then re-handcuffed Dr. Spiehs behind his back while he was naked. White clamped the cuffs onto Dr. Spiehs's wrists and forearms so hard that Dr. Spiehs felt what he describes as a bolt of electricity running up his spine. He repeatedly shouted that the cuffs were "way too tight" and that officers were twisting his arm. Only then, during the struggle to re-cuff him after he had been stripped naked, did an officer say, "Stop resisting."

47. After the strip, officers pulled Dr. Spiehs backward to the cell door while he remained handcuffed. He told them he could not bend because of pain in his back and arms. Officers forced his arms down through the narrow tray slot to remove the handcuffs, causing him to crouch in a painful position and causing additional pain to his wrists, hands, and back. Officers then closed the door and left. The forced strip took place between approximately 6:59 and 7:03 p.m. When the door closed, Dr. Spiehs's left wrist was bleeding; his wrists and forearms bore dark red marks, impressions, and cuts from the cuffs; and his hands turned white and purple and were cold, numb, and tingling.

48. No officer stated that the strip was being conducted for a medical reason or out of concern that Dr. Spiehs would harm himself. No mental-health professional completed an individualized suicide-risk assessment or documented any clinical finding that Dr. Spiehs was suicidal before his clothing was removed, and no clinician prescribed or recommended forcible clothing removal as medically necessary.

49. Sgt. White later wrote in his report that there were "no injuries to report." Defendant Stanfill recorded that she checked Dr. Spiehs for injuries after the strip and noted none. The force report was approved by Lt. Heldenbrand. The County's internal review of the incident, by Lt. Matt Biltoft and Deputy Director Josh Potter, resulted in no action.

50. Lt. Heldenbrand was notified of the suicide-watch placement at approximately 7:00 p.m. A County shift passdown entry made under her employee number records that Dr. Spiehs was "PBI to dress into sig 4." On information and belief, "PBI" refers

to a planned intervention and "sig 4" to suicide-watch status, and Heldenbrand authorized, approved, or directed the planned forced dress-out.

**E. ELEVEN HOURS NAKED**

51. The cell was cold and brightly lit all night. It had no toilet or sink, only a grated hole in the floor that could not be flushed from inside the cell and that, together with urine on the floor, produced a strong odor.

52. Before Dr. Spiehs arrived, officers had left two green items in a single pile on the cell floor: an oversized, heavy blanket designed to be worn and fastened with Velcro, lying on top of and covering a suicide-resistant smock. The two items were made of similar material, and the blanket concealed the smock. No staff member told Dr. Spiehs that a smock was in the cell, and he did not learn that it was there until the next morning. Because of the injuries to his wrists, hands, forearms, back, spine, and neck, Dr. Spiehs could not lift or manipulate the heavy blanket. He remained naked from approximately 7:03 p.m. until approximately 6:10 a.m. the next morning—approximately eleven hours.

53. Because of back pain, Dr. Spiehs remained standing at or near the cell door for roughly the first nine hours. He repeatedly told passing officers, including Defendants Bender and Lige, that he believed his wrists were fractured, that he could not use his arms, that his back hurt so badly he could not sit, and that he needed medical care. He told officers that because they had stripped him against his will and he could not lift the blanket, they would have to cover him. He told County officer Vicky Jackson that he could not use his arms to manipulate the blanket because it

was so large, bulky, and heavy. Officers acknowledged hearing him and walked away. No one offered to help him cover himself, and no one told him a smock was in the cell.

54. At approximately 11:15 p.m., Defendant Stanfill came to the cell. It was the first medical attention offered, although Dr. Spiehs had said immediately and repeatedly that he was injured. He told her he believed his wrists had been fractured by the force and the handcuffs, that his wrists, forearms, and back were injured and in severe pain, and that he could not move the blanket or sit down. She told him she could not perform a full examination because he was naked and that he needed to cover up; he told her he was physically unable to do so. She examined only his arms, through the locked tray slot. She noted that his hands had turned purple and white and were cold to the touch, and she observed red marks and abrasions on his wrists and forearms and dried blood on his hand. She documented wrist pain, redness from the restraints, cold hands, and his statement that he "can't feel anything." She did not examine him further, provide treatment, refer him to a provider, or escalate his condition.

55. At approximately 11:28 p.m., a watch officer recorded that Dr. Spiehs "refused to get dressed for nurse." No staff member had asked Dr. Spiehs to get dressed or told him that a smock was in the cell; staff had told him only that he needed to cover up, and he had told them he physically could not.

56. After midnight (County records place the attempt at approximately 12:23 to 12:25 a.m.; Dr. Spiehs recalls it as later in the night), Lt. Heldenbrand and a nurse came to the cell. Heldenbrand told Dr. Spiehs that to receive a medical examination he had to cover up. He told her and the nurse that he was physically unable to do so because

of the injuries and pain in his arms and back. Heldenbrand then assembled a cell-entry team, including a video camera operator, and at the cell door demanded that he cover up and sit against the far wall before they would enter. He told her he could do neither, and offered instead to stand against the far wall. Heldenbrand refused, called off the team, and left. No medical care was provided, and no further examination or treatment was provided before the morning shift change.

57. Close to 4:00 a.m., Dr. Spiehs was finally able to sit down. He had stood barefoot on the concrete floor for roughly nine hours, cold and shivering.

58. No staff member entered the cell between approximately 7:04 p.m. and 7:05 a.m. Officers recorded checks only at approximately fifteen-minute intervals, although the County's own suicide-watch standard calls for observation at a substantially greater frequency. No mental-health professional assessed Dr. Spiehs at any time during the night.

59. Monitoring that much less intensive than the County's asserted suicide-watch standard undermines the claimed safety rationale for the placement and supports an inference that staff did not regard Dr. Spiehs as presenting the degree of suicide risk supposedly warranting the strip and the restrictions imposed on him.

60. Dr. Spiehs received no food and no water overnight and was never permitted a phone call. By early morning his wrists remained visibly swollen and bore deep red impressions where the cuffs had been applied.

61. County officer Vicky Jackson, on watch post, told Dr. Spiehs quietly to "[d]o whatever you need to do to get out of this situation in the morning."

62. At approximately 6:10 a.m., cold, and with his arms and back recovered enough to try, Dr. Spiehs managed to drape the green blanket over his shoulders while seated, leaving the lower half of his body exposed. A nurse whom Dr. Spiehs identifies as Defendant Hay then looked into the cell through the door window and said to Lige, "He's just sitting in there with his balls hanging out." Dr. Spiehs told them he had heard the remark and that it was sexual harassment. Lige responded, in substance, "that's fine, we have video and audio recordings all throughout the hallway."

63. Early that morning, Defendant Downs came to the cell. She said ADC policy required a mental-health assessment every two hours for detainees on suicide watch, and expressed surprise when Dr. Spiehs told her none had been performed. When she returned, she observed swelling, discoloration, and marks around both wrists and remarked that his hands had previously been purple and white. Yet when she later documented her screening that morning, she recorded that he was "not ill or injured" and that his skin was free of lesions, and recorded his housing as "General Population" while the suicide watch remained active.

64. At approximately 7:05 a.m., several male officers, including the bearded sergeant—Defendant Torrez or, alternatively, Defendant Addington—who was the same sergeant who had locked Dr. Spiehs in Cell 4C the previous afternoon, entered the cell. They told Dr. Spiehs that, as part of the shift-turnover procedure, they had to inspect him visually, and directed him to open the blanket he had draped around his shoulders and expose his naked body, which he did. He then asked them to help him put the blanket on properly because he could not do it himself. The green item

he had draped over his shoulders was the oversized blanket, not the smock. They acknowledged that the blanket was big and bulky and difficult to manipulate, and it took three officers to put it on him.

65. Dr. Spiehs then told the sergeant that he still had not been permitted a phone call and asked to make one. The sergeant, agitated, said it was Dr. Spiehs's own fault because he had not given them an emergency contact. Dr. Spiehs had never been asked for an emergency contact. The sergeant then said, in substance, "See, this is why you're in here—you were arrested for disobeying a police order and you're still being defiant in here," and told him he would remain in the cell "until a judge sees you." The sergeant then directed the officers out of the cell.

66. Armor's records contain six "inmate refusal" forms attributed to Stanfill concerning Dr. Spiehs during the night, the last three of which are blank. The scanned copy of the forms bears a time earlier than the time written on the last form.

**F. THE MORNING STATEMENT AND RELEASE**

67. By the following morning, after being made to understand that he would remain confined unless he answered the behavioral-health questions, Dr. Spiehs concluded that he had no practical choice if he wanted to leave the cell and stated that he was not going to hurt himself. A worker had told him that if he did not answer, he would remain in the cell and would be transported to Valeo community mental health.

68. At approximately 9:46 a.m., Armor behavioral-health staff member Sydni Chance removed the suicide watch and placed Dr. Spiehs on close observation. Armor's records contain no step-down note, no structured suicide-risk assessment, and no protective-factors form. Surveillance video shows Dr. Spiehs still in the green suicide-

watch garment until approximately 10:17 a.m., although an entry records him as dressed out at 9:56 a.m.

69. Dr. Spiehs was released at approximately 10:30 a.m. on September 9, 2025. No one ever found that he had been suicidal.

### G. THE POLICIES BEHIND THE PLACEMENT AND THE STRIP

70. Armor's written protocol provides that detainees who refuse screening "will be placed on safety watch." Armor's behavioral-health screening form directs a watch placement when the detainee is "unable or unwilling to participate." In 2022, Armor revised that form to remove a prior requirement that the inability to participate result from a psychiatric cause.

71. Armor's own policies elsewhere direct that detainees who refuse screening be held under intake or medical observation with checks every two hours; state that suicide watch is never punitive and that clothing removal should be avoided; and require any suicide-resistant garment to prevent humiliation. None of those safeguards was applied to Dr. Spiehs.

72. Armor behavioral-health personnel had a defined and material decisionmaking role in whether suicide-resistant garments and blankets would be used, and Armor participated in review of the facility's suicide-prevention program.

73. The County has stated in its sworn interrogatory answers that detainees who refuse screening "are placed on suicide watch until the screening is completed"; that County staff had no authority to override or reassess Armor's watch decision; and that it was of "no purpose" to continue allowing Dr. Spiehs to "disrupt jail management."

74. The County trains its officers, in its academy lesson plan, in "clothing removal for placement on Suicide Watch or Intox protocol," including officers controlling each arm against a wall, removal of restraints, and takedowns for noncompliance. The procedure used on Dr. Spiehs matched that training.

75. A County corrections official later wrote, in February 2026, that Dr. Spiehs had been placed on suicide watch "because he refused to answer questions." After this incident, the County singled Dr. Spiehs out for special handling, including circulating a screenshot of his public video channel and directing staff to notify the Director whenever he was booked.

76. Together, Armor's refusal-based protocol, the County's practice of treating Armor's watch decisions as binding, and the County's trained clothing-removal procedure meant that an Armor refusal-based watch designation triggered County clothing removal without an independent County determination that the detainee presented a suicide risk. In Dr. Spiehs's case, County staff implemented that designation by forcibly removing his clothing.

**H. INJURIES**

77. The officers' actions during the forced dress-out caused and/or materially aggravated injuries to Dr. Spiehs's wrists, hands, forearms, arms, back, spine, and neck.

78. Dr. Spiehs photographed his visible injuries after his release. After his release, he had difficulty gripping a steering wheel, typing, carrying household items, and bending. He suffered pain, swelling, and loss of function in his wrists and hands, and continuing physical discomfort.

79. Dr. Spiehs suffered humiliation and emotional distress from being forcibly stripped naked in front of male and female staff and confined naked for approximately eleven hours. He remains fearful that future encounters with law enforcement or corrections staff will result in similar treatment.

## CLAIMS FOR RELIEF

### COUNT I — Fourth Amendment: Unreasonable Search (Forced Strip) (42 U.S.C. § 1983) Against Defendants White, Illo, Shannon, and Heldenbrand

80. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

81. Dr. Spiehs, a pretrial detainee held on a municipal-ordinance charge, had a right under the Fourth Amendment to be free from unreasonable searches, including the forcible removal of all his clothing and exposure of his naked body.

82. White, Illo, and Shannon forcibly removed all of Dr. Spiehs's clothing and exposed his naked body in front of multiple officers and female staff. Heldenbrand authorized, approved, or directed the planned forced dress-out.

83. The search was unreasonable in its scope, manner, justification, and place. Dr. Spiehs was held on a municipal-ordinance charge not associated with weapons or contraband. He was not being admitted to the general population; he was placed alone in a watch cell. He had already been patted down and held for hours. No officer had reasonable suspicion that he concealed contraband, and no officer claimed to be searching for contraband. No individualized finding was made that he posed a suicide risk. He was offered no opportunity to change privately, and less intrusive alternatives were available. The search was conducted by force, while he was

restrained, in the presence of female staff, including Bell, who filmed it, and as a consequence of his refusal to answer questions.

84. Defendants' conduct violated clearly established law. Well before September 2025, it was clearly established in this Circuit that a detainee held on a minor charge who is not placed in the general population may not be strip searched absent reasonable suspicion that he is concealing weapons or contraband, and that a search conducted in an abusive manner, unrelated to any legitimate institutional objective, is unreasonable. *Archuleta v. Wagner*, 523 F.3d 1278, 1283–85 (10th Cir. 2008); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1237–38 (10th Cir. 2020) (*Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012), does not authorize suspicionless strip searches of detainees not being admitted to general population); *Bell v. Wolfish*, 441 U.S. 520, 559–60 (1979). No reasonable officer could have believed that forcibly stripping a non-suicidal detainee naked in front of others, because he declined to answer questions, was lawful.

85. As a direct and proximate result, Dr. Spiehs suffered humiliation, emotional distress, physical injury, and other damages.

**COUNT II — Fourteenth Amendment: Excessive Force (42 U.S.C. § 1983) Against Defendants White, Illo, and Shannon**

86. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

87. As a pretrial detainee, Dr. Spiehs had a right to be free from force that was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

88. Before officers began removing his clothing, Dr. Spiehs was handcuffed, pinned against a wall, and offered no physical resistance. The force began when White began

pulling down his pants while he remained handcuffed. Resistance was not the predicate for the force; officers characterized his reaction to the force as resistance.

89. White, Illo, and Shannon used force that was not rationally related to any legitimate governmental objective and was excessive in relation to any such objective, including pinning Dr. Spiehs against the wall, applying pain compliance to his fingers and wrists, stripping him by force, re-cuffing him naked with cuffs he repeatedly said were too tight, twisting his arms, and forcing his arms down through the tray slot despite his complaints of injury.

90. Defendants' conduct violated clearly established law.

91. As a direct and proximate result, Dr. Spiehs suffered physical pain, injury to his wrists, hands, arms, and back, humiliation, emotional distress, and other damages.

**COUNT III — Fourteenth Amendment: Pretrial Punishment and Punitive Conditions of Confinement (42 U.S.C. § 1983) Against Defendants Jorgensen, Miller (in the alternative), White, Heldenbrand, Hay, Bell, Priest, and Torrez or, in the alternative, Addington**

92. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

93. A pretrial detainee may not be punished. A condition imposed with an expressed intent to punish, or not reasonably related to a legitimate governmental objective, or excessive in relation to that objective, is punishment. *Bell v. Wolfish*, 441 U.S. 520 (1979); *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2013); *Colbruno v. Kessler*, 928 F.3d 1155 (10th Cir. 2019).

94. Jorgensen, or alternatively Miller, placed Dr. Spiehs on suicide watch because he declined to answer questions, not because of any individualized finding of risk, and communicated that decision to County security knowing it would result in his

clothing being removed. Bell and Priest threatened and initiated that consequence for his silence. White carried it out and told Dr. Spiehs it was imposed because he did not answer questions. Heldenbrand authorized the planned dress-out and maintained the conditions. The bearded sergeant—Torrez or, alternatively, Addington—continued the confinement and told Dr. Spiehs that his defiance was "why you're in here."

95. Hay participated in Dr. Spiehs's heightened-observation process by entering the "Screen Pending" status the night before. The next morning, she personally saw Dr. Spiehs still involuntarily exposed after approximately eleven hours, recognized that exposure, and took no corrective action. Her contemporaneous remark that he was "just sitting in there with his balls hanging out" further supports the inference that the continued exposure was punitive or gratuitous rather than medically necessary.

96. The resulting conditions—forced stripping, approximately eleven hours of naked confinement in a cold, brightly lit, unsanitary cell, denial of water, food, and a phone call, and withholding of medical care conditioned on compliance—were imposed with an intent to punish and coerce, were not reasonably related to any legitimate objective, and were excessive in relation to any asserted safety purpose.

97. Defendants' conduct violated clearly established law. No reasonable official could have believed that suicide-watch restrictions and naked confinement could be imposed on a non-suicidal pretrial detainee as a consequence of his silence.

98. As a direct and proximate result, Dr. Spiehs suffered loss of liberty, humiliation, emotional distress, physical pain, and other damages.

### COUNT IV — First Amendment: Retaliation (42 U.S.C. § 1983) Against Defendants Jorgensen, Miller (in the alternative), White, Bell, and Priest

99. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

100. Dr. Spiehs engaged in protected activity. During booking and in the minutes before the forced strip, he told the officers that holding him until he answered questions was illegal, that they could not coerce him, and that he would hold them accountable, and he asked for an officer's badge number. Before September 8, he had also engaged in public advocacy, open-records requests, and protests directed at local officials. He also declined to answer non-identifying questions after identifying himself.

101. Defendants' actions—suicide-watch placement, forced stripping, and naked confinement—would chill a person of ordinary firmness from continuing to engage in that activity.

102. Each Defendant named in this Count knew of Dr. Spiehs's protected activity before acting. Bell and Priest recognized him on arrival from his June intake and handled his booking, and Bell recorded the handheld video on which he made the statements described above. Jorgensen or, alternatively, Miller screened him and charted his refusal as the reason for the placement. White heard Dr. Spiehs tell him, on the handheld video Bell recorded, that what the officers were doing was illegal and that they could not coerce him, and White responded that he was on suicide watch because he did not answer questions and that removing his clothes was policy. White's own use-of-force report confirms that Dr. Spiehs "was saying that he was

being held illegally," and that White then told him that "due to his uncooperative behavior" he "was going to be dressed into the facility." The forced strip followed.

103. Defendants' actions were substantially motivated by Dr. Spiehs's protected activity. On June 14, 2025, the same refusal by the same detainee produced no watch at all. In the interval, Dr. Spiehs's advocacy had drawn the attention of ADC leadership; Bell and Priest recognized him on arrival as "the same guy who didn't want to answer our questions"; and the County has identified his "threatening litigation" as a reason he supposedly posed a risk.

104. Defendants' conduct violated clearly established law.

105. As a direct and proximate result, Dr. Spiehs suffered loss of liberty, humiliation, emotional distress, physical injury, and other damages.

**COUNT V — First Amendment: Compelled Speech (42 U.S.C. § 1983) Against Defendants Bell, Priest, Jorgensen, Miller (in the alternative), and White**

106. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

107. The First Amendment protects the right to refrain from speaking. Beyond identifying himself, Dr. Spiehs had a right not to be compelled, through punishment or coercive confinement, to answer non-identifying questions about his employment, education, religion, and mental health.

108. Defendants used the threat and imposition of suicide watch, stripping, naked confinement, the stopping of his bond, and continued confinement "until you talk to them" to compel Dr. Spiehs to answer. The coercion worked: by the following morning,

believing he had no practical choice if he wanted to leave the cell, he made the statement Defendants demanded.

109. That coercion was not reasonably related to any legitimate penological interest and violated the First Amendment.

110. As a direct and proximate result, Dr. Spiehs suffered loss of liberty, humiliation, emotional distress, and other damages.

**COUNT VI — Fourteenth Amendment: Procedural Due Process (42 U.S.C. § 1983) Against Defendants Jorgensen, Miller (in the alternative), White, and Heldenbrand**

111. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

112. Suicide-watch status as imposed here—forced stripping, naked isolation, and loss of ordinary privileges—was a severe, stigmatizing deprivation of liberty for a pretrial detainee.

113. Defendants imposed that status because Dr. Spiehs declined to answer questions, not on any individualized finding of suicide risk, and maintained it for approximately eleven hours without notice of any legitimate basis, without any opportunity to contest it, without any individualized clinical assessment, and without any prompt review of whether it remained justified, even though Armor's own policies required assessment and reassessment.

114. Plaintiff does not contend that every emergency suicide precaution requires a hearing in advance. The deprivation here was a punitive classification presented as a medical one, imposed without any finding of risk and continued without review.

115. Defendants' conduct violated the Due Process Clause of the Fourteenth Amendment.

116. As a direct and proximate result, Dr. Spiehs suffered loss of liberty, humiliation, emotional distress, and other damages.

**COUNT VII — Fourteenth Amendment: Deliberate Indifference to Serious Medical Needs (42 U.S.C. § 1983) Against Defendants Stanfill, Heldenbrand, Downs, Bender, and Lige**

117. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

118. After the forced strip, Dr. Spiehs had serious medical needs: injured, discolored, swollen wrists and hands with bleeding, abrasions, and loss of sensation, cold hands, back pain severe enough that he could not sit, and the effects of hours of naked exposure in a cold cell. Those needs were documented by Stanfill at 11:15 p.m. and were obvious to a layperson.

119. Stanfill knew of those needs, including his report that he believed his wrists were fractured, and of the substantial risk of harm, and disregarded it by refusing a full examination because he was naked and providing no treatment, referral, or escalation. Heldenbrand knew of them and conditioned medical care on Dr. Spiehs covering himself and sitting on the floor when he told her he physically could not do either, refused his offer to stand, and called off the cell entry. Bender and Lige heard his repeated reports of injury and requests for medical care and did nothing. None of them told him a smock was in the cell or helped him cover himself. Downs observed swelling, discoloration, and marks on both wrists and recorded that he was not ill or injured.

120. Each of these Defendants was deliberately indifferent to Dr. Spiehs's serious medical needs. Defendants employed by Armor are not entitled to qualified immunity. *Tanner v. McMurray*, 989 F.3d 860 (10th Cir. 2021).

121. As a direct and proximate result, Dr. Spiehs suffered prolonged pain, aggravated injury, humiliation, emotional distress, and other damages.

**COUNT VIII — Failure to Intervene in Constitutional Violations (42 U.S.C. § 1983) Against Defendants Bell, Lige, and Heldenbrand**

122. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

123. An officer who knows that another officer is violating a detainee's constitutional rights, and has a realistic opportunity to intervene, is liable for failing to do so. That liability is not limited to excessive force. *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022).

124. Bell stood in the doorway filming the entire strip, from the officers' first contact through the re-cuffing, while Dr. Spiehs asked her why she was "just standing there filming." Lige was present, told Dr. Spiehs the strip was happening because he had not complied with answering questions, and did nothing to stop it. Bell and Lige each had a realistic opportunity to stop the unreasonable search and the excessive force as they occurred and failed to do so.

125. Heldenbrand's liability does not depend on her presence during the strip. She was notified of the placement and the planned dress-out before it occurred and had authority to stop it. Afterward, she personally came to the cell, was told that Dr. Spiehs could not cover himself because of the injuries to his arms and back, and had hours in which to end the naked confinement. She did not. She had a realistic

opportunity to intervene in the planned dress-out and, over the following hours, to end the continuing punitive confinement, and failed to do so.

126. As a direct and proximate result, Dr. Spiehs suffered the injuries and damages described above.

**COUNT IX — Supervisory Liability (42 U.S.C. § 1983) Against Defendants White and Heldenbrand**

127. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

128. Each supervisor's own conduct is affirmatively linked to the violations. White personally directed and participated in the forced strip and the force used. Heldenbrand authorized the planned dress-out; after learning that Dr. Spiehs could not cover himself because of his injuries, she maintained the naked confinement and called off the overnight medical entry; and she approved the force report that recorded no injuries. Each acted with the state of mind required for the underlying violations. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

129. As a direct and proximate result, Dr. Spiehs suffered the injuries and damages described above.

**COUNT X — Municipal Liability (42 U.S.C. § 1983) Against Defendant Shawnee County**

130. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

131. The violations described above were caused by the County's official policy. The County trained its officers to remove a detainee's clothing upon placement on suicide watch, and, as the County has described its own practice in sworn interrogatory answers, detainees who refuse screening "are placed on suicide watch until the

screening is completed." Those policies, as implemented here, were the moving force behind the forced strip and naked confinement. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

132. In the alternative, the County delegated suicide-watch decisions to Armor and made Armor's decisions binding on County custody staff, so that Armor's refusal-based protocol operated as County policy.

133. In the further alternative, the violations were caused by the County's custom of using suicide watch as a response to refusal to answer intake questions; and by its failure to train and supervise officers on the constitutional limits on clothing removal, use of force, and medical response for non-suicidal detainees, where the need for such training was obvious.

134. The County acted with deliberate indifference to the known or obvious consequence that its policies would cause non-suicidal detainees to be stripped and subjected to severe suicide-watch restrictions merely because they declined to answer screening questions.

135. As a direct and proximate result, Dr. Spiehs suffered the injuries and damages described above.

**COUNT XI — Private-Entity Policy Liability (42 U.S.C. § 1983) Against Defendant Armor Health of Shawnee County, LLC**

136. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

137. A private entity performing a traditional public function in a jail is liable under § 1983 when its policy or custom causes a constitutional violation.

138. Armor maintained a written policy under which a detainee's refusal or unwillingness to participate in screening resulted in suicide-watch placement without any individualized risk finding. Jorgensen applied that policy to Dr. Spiehs, documented refusal as the reason for the placement, and notified County security, and the designation triggered the County's trained clothing-removal procedure.

139. Armor's policy, as implemented, was the moving force behind the violations described above. Armor knew that its watch designation triggered the County's clothing-removal procedure and the use of suicide-resistant garments and blankets, yet maintained a protocol that converted silence into watch status, removed the psychiatric-cause limitation from its screening form, and allowed placement and removal without the assessment and reassessment its own policies required.

140. Here, Armor's designation resulted in Dr. Spiehs being forcibly stripped and confined naked for approximately eleven hours.

141. In the alternative, the violations were caused by Armor's custom of placing detainees on suicide watch for refusing to answer screening questions.

142. Whether Armor's protocol required the result on September 8 or left it to staff discretion, it produced fundamentally different treatment of the same refusal by the same detainee on June 14 and September 8, with no documented safety distinction.

143. As a direct and proximate result, Dr. Spiehs suffered the injuries and damages described above.

**COUNT XII — Negligence (Kansas Law) Against Defendants Armor, Jorgensen, Miller, Stanfill, Hay, and Downs**

144. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

145. Armor and its staff owed Dr. Spiehs a duty to exercise reasonable care in screening, placing, monitoring, assessing, and treating him.

146. They breached that duty, including by placing him on suicide watch without any assessment; failing to perform the assessments and reassessments their own policies required; failing to evaluate, treat, refer, or escalate his documented wrist and hand injuries and loss of sensation; failing to ensure he could use the garment and blanket provided; and recording that he was not ill or injured despite observed swelling, discoloration, and marks.

147. Hay, an Armor nurse already involved in his heightened-observation status, personally observed Dr. Spiehs still partially exposed the following morning and commented on his exposed body, yet failed to assess him, help him cover himself, determine why he remained exposed, or obtain assistance for him.

148. Armor is vicariously liable for the negligence of its employees and agents acting within the scope of their employment.

149. As a direct and proximate result, Dr. Spiehs suffered physical injury, prolonged pain, emotional distress, and other damages.

**PRAYER FOR RELIEF**

Plaintiff requests that the Court enter judgment in his favor and award:

A. Compensatory damages against all Defendants;
B. Nominal damages;
C. Punitive damages against the individual Defendants and Defendant Armor;
D. Costs and reasonable attorney's fees under 42 U.S.C. § 1988;
E. Pre- and post-judgment interest as allowed by law; and
F. Such further relief as the Court deems just.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

By:/s/Linus L. Baker

Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085-8922
913.486.3913 913.232.8734 (fax)
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff